Gilmore, C. J.
In November, 1859, Samuel B. Keys was. the owner in fee of certain real estate in Cincinnati, which he had mortgaged to one Ruffner to secure the payment of certain notes falling due at intervals between that date and 1866. On the 4th of November, 1859, Samuel B. Keys and Julia B., his wife (the latter having only an inchoate right of dower therein) conveyed said real estate to Daniel J. Eallis, who paid Samuel B. Keys the full consideration therefor. On the 8th of December, 1859, Samuel B. and Julia B. Keys joined in the execution of a sealed instrument to Eallis binding themselves, in terms, to pay off the notes above mentioned as they respectively became due, and thereby discharge the lien on the property so conveyed. Most of the notes were paid by Samuel B. Keys as they became due, but the notes falling due in 1865 and 1866, aggregating in amount about $4,300, were not paid.
Between 1866 and 1873 Samuel B. Keys became insolvent. In 1859 Mrs. Keys was not the owner of either seperate or general property.
By inheritance from her brother, David, in 1868, and also from her brother,- Charles, in June, 1874, she became seized in fee of an undivided portion of certain real estate in Cincinnati, from which she derives an income of about $1,500 per annum.
*266 Samuel B. Keys, being insolvent, Eallis was compelled to pay to the representatives of Ruffner $4,300, being the balance remaining unpaid on the notes mentioned in the' scaled instrument above alluded to; and in November, 1874, he commenced an action, founded on the sealed instrument, in the Superior Court of Cincinnati, against Samuel B. and Julia B. Keys, by which he seeks to charge the separate estate of the latter, inherited from her brothers, as above stated, with the payment of the $4,300 above mentioned. Mrs. Keys alone defends.
The questions raised in the case may be resolved into this one: Can real estate inherited by a married woman since the passage of the act of 1861 be charged in equity for the payment of engagements entered into by her previous to the passage of the act ?
It is well settled, both in England and this country, that in equity a married woman may, under some circumstances, charge separate property of which she is at the time in possession with the payment of her engagements. It is unnecessary here, however, to notice the circumstances under which such a charge will be declared.
Not a single case has been cited by counsel, nor are we aware of one, in which it has been held that the engagoments of a married woman, entered into when she had no separate property, will bind her after-acquired separate property. The case is, therefore, a novel one.
If there is any ground upon which a court of equity can declare such a charge in this case, it must be either that of estoppel or that of intention.
There are no circumstances disclosed in the ease that can estop Mrs. Keys from denying that by the execution of the instrument in question, she created a charge on her after-acquired separate property.
I am not prepared to say that if a married woman having separate property in expectancy should enter into an engagement expressly with reference to it, and intending thereby to create a charge upon it — that a court of equity would not enforce the charge, when the property *267 afterward came into her possession ; for this would be carrying into effect the intention of the parties.
But in the absence of such an intention, either expressed or to be clearly implied from the facts, a married woman can not, by her engagements, incur liabilities for the payment of which her after-acquired separate property can be charged.
In 1859, when Mrs. Keys signed the instrument in question, unless she was endowed with the attribute oí prescience, which can not be presumed, it would have been impossible for her to know that she would, after that time, inherit from her brothers separate property; and, therefore, impossible for her to have intended to charge it by the execution of the instrument. At that time, land that came to a married woman by inheritance, in this state, was her general property, which she was incapable of incumbering, except in the mode prescribed by the statute; nor could she charge it in equity tor the payment of her engagements, even when credit was given to her on the faith of such property. If, therefore, the law had remained unchanged, these lands which afterward descended to her ■would have been her general property, which, as before said, could not have been charged by her even if she - had intended to do so.
By virtue of the first section of the act of 1861, as amended in 1866' (S. & S. 889, 391), lands thereafter descending to a married woman become her separate property, which she may charge for the purposes mentioned in the statute, and also for the payment of engagements entered into by her after acquiring the property, in cases in which equity will declare the charge.
But to enable us to find that the instrument executed by Mrs. Keys in 1859, created a charge on separate property mnerited by her many years afterward, we must find, at least, that she could have had the property in her mind, for without this she could not have intended to charge it. How could she have had the property in her mind ? She could not have known that her brothers would acquire or *268 retain the property; that they would die intestate and childless; or if these contingencies could have been known and anticipated, she certainly could not have known that the legislature would afterward so change the law, that property descending to. her after the change would be her separate property, when, if the same property had descended to her before the change, it would have been her general property. Under these circumstances, we do not see how she could have intended to charge this after-acquired separate property; and without this it can not be charged in equity.
Mrs. Keys was entitled to judgment on the statements of the petition; and hence the judgment of the superior court in her favor must be affirmed.